EDUVIGIS GUILLOT, por sí y como madre con patria potestad de su menor hijo LESTER AGUSTÍN GARCÍA, y DAMIANA GARCÍA, recurrentes, *v.* COMISIÓN INDUSTRIAL DE PUERTO RICO, demandada.

Núm. 242.—*Sometido:* Junio 8 de 1942. *Resuelto:* Julio 8, 1942.

*Pedro M. Porrata* y *Juan C. Santiago Matos,* abogados de los recurrentes; *Hon. Procurador General George A. Malcolm, G. Benítez Gautier, Procurador General Auxiliar* y *G. Atiles Moréu, A. de Jesús Matos* y *J. Correa Suárez,* abogados los tres últimos del Fondo del Seguro del Estado, abogados del Administrador del Fondo.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

Eduvigis Guillot, por sí y como madre con patria potestad de su menor hijo Lester Agustín García, y Damiana García solicitaron de esta corte que revisara la decisión de la Comisión Industrial de Puerto Rico del 27 de marzo de 1942, por virtud de la cual desestimó la apelación que interpusieron contra la resolución del Administrador del Fondo del Seguro del Estado del 9 de marzo de 1938, declarando no compen-

sable el accidente que ocasionó la muerte del obrero Agustín García.

Alegaron que la Comisión erró al resolver que es indispensable que el sitio donde ocurra un accidente esté bajo el control del patrono para que el accidente sea compensable; que una carretera pública que atraviesa el predio de un patrono y que forma parte indispensable de los medios de comunicación para la entrada y salida a la finca del patrono, no es parte de los *premises* del patrono a los efectos de la Ley de Compensaciones a Obreros; al no aplicar al de autos la doctrina del caso de *Bountiful Brick Co.* v. *Giles,* (1928) 72 L. Ed. 507, donde el Tribunal Supremo de los Estados Unidos resolvió que "the necessary way of ingress and egress" a los predios donde se trabaja, es parte de los predios; al darle a su propia declaración de hechos probados en cuanto a la relación entre el predio y la carretera, un alcance jurídico distinto al que tiene de acuerdo con la ley y la jurisprudencia, y al aplicar a los hechos de este caso la doctrina relativa a los "riesgos de la calle" cuando la aplicable es la doctrina relativa a las incidencias y riesgos existentes en las inmediaciones del sitio donde el patrono invita al obrero a trabajar.

Expedido el auto, la Comisión remitió el expediente original y el ocho de junio último se celebró la vista del recurso con asistencia e informes de los abogados de los peticionarios y del Fondo del Seguro del Estado, quienes previamente habían radicado sus alegatos escritos.

A virtud de la investigación en primera instancia practicada, el Administrador del Fondo del Seguro del Estado expuso sustancialmente los hechos y los apreció en relación con la ley, como sigue:

"De la investigación practicada en el caso se desprende que el suceso tuvo lugar después de las horas de trabajo, en una vía pública, cuando el obrero iba de regreso a su hogar montado en una bicicleta. Evidentemente este accidente no está cubierto por la Ley de Compensaciones por Accidentes del Trabajo, aprobada en 18 de abril de 1935..."

La Comisión Industrial, como resultado de la vista celebrada a virtud de la apelación para ante ella interpuesta, declaró probado que

"Para el día 6 de mayo de 1937, llevaba ya tres, que el obrero del caso Agustín García, venía trabajando como carretero en la colonia de cañas 'Cintrona 2a.,' propiedad de la Sucn. J. Serrallés, sita en la jurisdicción de Juana Díaz, ganando $1.75 como jornal. En ese día, al rendir su labor a las 4:30 de la tarde, luego de asearse y cambiar sus ropas de trabajo por las de calle, montó en su bicicleta, cuyo medio de transporte utilizaba para trasladarse hasta el lugar de su trabajo, desde Ponce donde vivía, y corriendo por el camino carretera de dicha colonia, salió a la carretera pública, que conduce de Ponce a Guayama, conocida por 'Carretera del Litoral.' Había caminado ya por la derecha de ésta con dirección al pueblo de Ponce, aproximadamente medio kilómetro, cuando al llegar frente a la gran calle que desde dicha carretera conduce, por terrenos de la Hacienda Mercedita a la Central de este nombre, se enfrentó con dos automóviles que venían a gran velocidad desde Ponce, uno de los cuales, el de la izquierda, maniobró para entrar a dicha Central, y con tal motivo Agustín García, para evitar una colisión con él, desvió ligeramente hacia su izquierda, chocando entonces con el otro automóvil que venía parejo al anterior, el cual, arroyándolo, le hirió gravemente, muriendo pocas horas después en una de las clínicas de la ciudad de Ponce, por consecuencia de las lesiones sufridas, dejando como pretensos beneficiarios a su esposa legítima Sra. Eduvigis Guillot, a un hijo menor de edad habido en su matrimonio con ésta, de nombre Lester Agustín, y a su señora madre, doña Damiana García."

Estudió seguidamente las alegaciones de los recurrentes, analizó la jurisprudencia que invocaron y la que consideró aplicable, y finalmente fijó su criterio en los siguientes términos:

"Es nuestra opinión que de acuerdo con los hechos que estuvieron bajo nuestra consideración y estudio, el accidente de autos, en el que Agustín García halló la muerte, es uno corriente y propio de una vía pública, conocido por 'riesgos de la calle' y sobre los cuales esta Comisión Industrial ha resuelto reiteradamente en sentido negativo, a la protección de la Ley de Accidentes del Trabajo... En todos ellos la Comisión Industrial ha considerado accidentes ocurridos a

óbreros en vías públicas, llámense carreteras o calles de las poblaciones, en los momentos en que discurrían con dirección al lugar de su trabajo, o volvían de éste hacia sus casas, pero fuera del sitio o lugar donde trabajaban, y sin que el riesgo propio de estos lugares públicos constituyeran un incidente del trabajo que realizaban."

Pedida reconsideración, la petición fué negada y se acudió entonces a éste Tribunal.

Al argumentar los peticionarios los errores que imputan a la Comisión ponen especial énfasis en el sitio en que ocurrió el accidente y en dos decisiones judiciales, una de la Corte Suprema de los Estados Unidos y otra de la Corte Suprema de Alabama.

Con respecto al sitio, conocemos los hechos declarados probados por la Comisión. Veamos si, habida en consideración la ley vigente en esta Isla, que ordena que sus disposiciones se aplicarán a los obreros y empleados que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste y como consecuencia del mismo, son aplicables o no las decisiones indicadas.

La de la Corte Suprema es la de *Bountiful Brick Co.* v. *Giles,* 276 U. S. 154, 72 L. Ed. 508. La jurisprudencia que establece se resume así:

"Constitucionalmente puede imponerse responsabilidad, bajo una ley de compensaciones a obreros, cuando, contribuyendo sustancialmente al daño, existe una relación de causa entre el daño sufrido por el obrero y el trabajo a que éste se dedicaba en el momento.

"Si el obrero sufre un accidente mientras atraviesa, con el consentimiento expreso o implícito del patrono, al dirigirse a o regresar de su trabajo, terrenos de otra persona que están tan próximos y relacionados en tal forma a los del patrono que prácticamente forman parte de éstos, el accidente es uno que surge como consecuencia y durante el curso del empleo tanto como si hubiera sucedido mientras el obrero se ocupaba en su trabajo en el sitio de su ejecución.

"La concesión de compensación a un obrero de una fábrica de ladrillos que fué muerto por un tren mientras cruzaba la vía, fuera del camino público, al dirigirse a su trabajo—*considerada* compatible

con la Enmienda Catorce, en vista de los hechos expuestos en la opinión."

Como puede verse, la regla establecida lo fué "en vista de los hechos expuestos en la opinión."

Esta fué emitida por el Juez Sr. Sutherland y en ella se narran y comentan los hechos a los fines de la aplicación de la ley y la jurisprudencia, como sigue:

"En junio 17, 1925, Nephi Giles, un empleado de la compañía fabricante de ladrillos, fué arrollado y muerto por un tren al cruzar las vías de la Bamberger Electric Railroad Company mientras se dirigía a su trabajo. El cercado de la compañía de ladrillos radica en el lado oeste de las vías del ferrocarril, adyacente a éstas y conectado con ellas, según concluyó la Comisión, por un corto desvío. Las vías del tren se extienden hacia el norte y el sur. Giles vivía— y la evidencia indica que los empleados generalmente vivían—al lado este de las vías del tren. Al ir de sus casas a la fábrica les era imposible hacerlo sin cruzar las vías del tren. Había un cruce público, conocido por 'Burns road,' como a 200 yardas al sur de la fábrica. La vía de la compañía del ferrocarril, situada en el lado opuesto del cercado de la fábrica, tenía una cerca a ambos lados. Giles, al igual que otros empleados, al ir a su trabajo seguía a veces la carretera Burns hasta el cruce del tren, y entonces seguía hacia el norte por la vía del tren hasta la esquina noreste de la fábrica y de allí, a través de un hueco en la verja, hasta la entrada norte de la fábrica; y a veces algunos empleados, entre ellos Giles, entraban a la vía por la verja del lado este en sitios al norte de la carretera Burns y de allí cruzaban la vía más o menos frente al hueco. Esta variada práctica era bien conocida por la compañía y llevada a cabo sin objeción por parte de ésta. Era posible llegar a la fábrica siguiendo la carretera Burns a través de las vías y durante un trecho al oeste y entonces al norte y este hasta llegar a la entrada oeste de la fábrica, pero esta ruta era larga, tortuosa e inconveniente y, hasta donde demuestra la evidencia, no se usaba. Una honda zanja, abierta al norte de la carretera, impedía el ganar acceso al extremo sur de la fábrica.

"El gerente de la compañía declaró que él conocía los muchos medios de que se valían los empleados para cruzar las vías; que había visto a Giles valerse de todos; que le advirtió un número de veces que tuviera cuidado, pero que no le ordenó a él ni a ninguno de los empleados que suspendieran estas maneras de cruzar.

"Al ocurrir el accidente que culminó en su muerte, Giles entró a la ruta de Bamberger a través de una verja de alambre en el lado este, en un punto casi opuesto al hueco en la verja del oeste. Fué arrollado mientras cruzaba la vía en dirección a esta salida.

" . . . . . . . .

"El determinar si Giles fué negligente en entrar a través de la verja en la parte que lo hizo, o en cruzar las vías, o en no escoger el sitio más seguro, son cuestiones irrelevantes a la investigación. Se impuso responsabilidad constitucionalmente bajo el estatuto de compensaciones a obreros de Utah si hubo una relación causal entre la lesión recibida y el empleo a que Giles se dedicaba que sustancialmente contribuyera a las lesiones. *Cudahy Co.* v. *Parramore,* 263 U. S. 418, 423-425. Y un empleo incluye no sólo la realización verdad del trabajo, si que un razonable margen de tiempo y espacio necesarios para ser utilizados en trasladarse a y desde el sitio donde el trabajo ha de llevarse a cabo. Si el empleado resulta lesionado mientras se traslada, con el expreso o tácito consentimiento de su patrono, a o desde su trabajo por una ruta dentro de la propiedad (*premises*) del patrono, o dentro de otras de otra persona tan cercanas y relacionadas con la primera que sean, como cuestión de hecho, una parte de la propiedad del patrono, la lesión es una resultante de y sufrida en el curso del empleo al igual que si se hubiera recibido mientras el obrero se dedicaba a su trabajo en el sitio donde acostumbraba llevarlo a cabo. En otras palabras, el empleo puede comenzar, en cuanto a tiempo, antes de empezarse el trabajo, y en cuanto a espacio, antes de llegar al sitio donde haya de llevarse a cabo el trabajo. Probablemente, y como regla general, puede decirse que el empleo comienza cuando el empleado llega a la entrada de la propiedad del patrono donde habrá de llevarse a efecto el trabajo; pero es evidente que en algunos casos la regla es amplia e incluye propiedades adyacentes, utilizadas por el empleado como un medio de ingreso o egreso con el consentimiento expreso o tácito del patrono. *Id.,* pág. 426. Y véanse, en general, *Procaccino* v. *Horton & Sons,* 95 Conn. 408; *Merlino* v. *Connecticut Quarries Co.,* 93 Conn. 57: *Corvi* v. *Stiles & Reynolds Brick Co.,* 103 Conn. 449; *Starr Piano Co.* v. *Industrial Acc. Com.,* 181 Cal. 433, 436-438; *Sundine's Case,* 218 Mass. 1, 4.

"En el caso de *Parramore,* el mismo estatuto de Utah se hallaba bajo estudio, y decidimos que el mismo era válido al aplicarse al caso de un empleado que, mientras se dirigía a su trabajo, fué muerto por una locomotora en un paso a nivel público de un ferrocarril adyacente a la factoría de su patrono. Allí, como ahora, era nece-

sario que los empleados, para llegar al sitio de su trabajo, cruzaran las vías, y ellos fueron en realidad invitados por el patrono a hacerlo. La diferencia entre los dos casos estriba en que en el primero el cruce usualmente utilizado radicaba por completo en un camino público, mientras que aquí la ruta seguida radicaba en parte a lo largo de las vías del ferrocarril, siendo cruzadas dentro de la ruta de éste dondequiera que los empleados decidieran de propia voluntad hacerlo.

"El caso de autos, si bien se acerca más a la línea fronteriza (*border line*) cae dentro de la regla establecida en el caso de *Parramore*. Ya que el único punto de acceso a su fábrica de ladrillos viniendo del este era a través de las vías del ferrocarril, la compañía necesariamente había de tener en mente el cruce de éstas por sus empleados. No habiendo ningún camino definitivo indicado por la compañía o seguido por los empleados, quienes, con pleno conocimiento y aquiescencia de la compañía cruzaban usualmente por donde mejor les parecía, resulta que, no importa cómo el cruce se llevara a cabo, el riesgo que se asumía al así hacerlo era razonablemente incidental al empleo y se adhería a éste como una cláusula implícita del mismo. Si fuere necesario fortalecer la implicación del consentimiento por parte de la compañía al cruce de sus empleados por cualquier sitio que les plugiere, bastaría con referirse al testimonio del gerente, quien, conociendo la costumbre, no la prohibió, si que la aprobó al advertirle simplemente a Giles que tuviera cuidado."

Como puede verse, los hechos son distintos a los de este caso. Allí el obrero, para poder entrar a la planta de su patrono o salir de ella, tenía que pasar forzosamente sobre la vía de un ferrocarril adyacente, mientras que aquí el obrero salió de la colonia Cintrona 2da., donde trabajaba, a la Carretera del Litoral, que es una vía pública insular y por ella caminó sin dificultad un largo trecho. El accidente ocurrió en esa vía.

Se hace gran fuerza en que frente al sitio del accidente está la gran calle que conduce a la central del patrono cuyo negocio aumenta el tránsito de modo extraordinario, pero aun en la hipótesis de que por pertenecer al mismo patrono la colonia y la central pudiera concluirse que se trataba de un mismo negocio, aun así, no podría llegarse tan lejos como pretenden los apelantes, esto es, a resolver que el accidente

ocurrió no en la calle sino en los premises del patrono, o en un sitio adyacente conectado con ellos de tal modo que prácticamente pudiera considerarse como parte de los suyos propios.

Una vez que el obrero entró francamente en la carretera insular, al pasar por el sitio de ella frente al cual estaba la gran calle de la central, se encontraba en la misma situación que todas las personas que por allí transitaban. El mayor movimiento que pudo derivarse del negocio afecta a todos en general, no a los obreros únicamente en particular.

Los hechos de la decisión de *Alabama, Barnett* v. *Britling Cafeteria Co.,* 225 Ala. 462, 143 So. 813, 85 A.L.R. 85, surgen claros y completos del siguiente breve resumen:

"Las lesiones recibidas por una empleada que resbala en la acera inmediata a la entrada del lugar de negocios de su patrono, a donde ella iba a entrar en camino para su trabajo, debido a hielo formado de la acumulación del agua usada en el lavado de las ventanas, se interpretan como sufridas en el curso del empleo a los efectos de la Ley de Compensaciones a Obreros."

Como también puede verse, la situación era distinta.

Por más esfuerzos que se hagan para demostrar lo contrario y por más jurisprudencia que se cite, siempre tendrá que concluirse que aquí la aplicable es la regla general, no la excepción. Mientras la ley no varíe en el sentido de ordenar una póliza para asegurar al obrero en todas partes, mientras permanezca redactada en los términos en que ahora lo está, los principios que rigen en casos como éste son los expuestos con sencillez y precisión por Lord Cozens-Hardy en *Longhurst* v. *John Stewart & Son, Ltd.,* 2 K. B. 803, 32 T.L.R. 722, W. C. & I. Rep. 292, 9 B. W. C. C. 605 (affirmed 1917 App. Cas. 249), citado en *Burchett* v. *Anaconda Copper Min. Co.,* 48 Idaho 524, 530, a saber:

" 'A mi entender se establecen dos proposiciones por las autoridades: (*a*) El empleo de un obrero no comienza sino desde que abandona un camino público, y no termina hasta tanto no llegue a un camino público. Mientras está en la carretera está ejerciendo

682

sus derechos como parte del público, y no un derecho resultante de su contrato de trabajo. (*b*) Cuando el obrero está en terrenos pertenecientes a su patrono, sería un transgresor, si no fuera por su contrato de trabajo, y está dentro de la protección de la Ley, aunque el accidente ocurra cuando no se halle en realidad trabajando, sino que meramente está yendo o regresando de su trabajo.' "

Como se dijo en *Bacó* v. *Comisión,* 52 D.P.R. 866, 873, que es un caso que guarda estrecha relación con éste, "La dificultad en la resolución de casos de esta naturaleza estriba en que la tendencia natural es hacia la compensación. De ahí que el precepto de la ley se haya extendido a veces más allá de lo razonable con detrimento del Fondo del Estado que no fué calculado a base de tales riesgos."

*Procede la confirmación de las resoluciones recurridas.*

El Juez Asociado Sr. De Jesús no intervino.